**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**Western Division at Cincinnati**

| | | |
|---|---|---|
| QUEEN CITY HOSPICE, LLC | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No.:1:26-cv-1065 |
| ROBERT F. KENNEDY, JR., SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES | ) | |
| Defendant. | ) | |

## COMPLAINT FOR JUDICIAL REVIEW

Plaintiff, Queen City Hospice, LLC ("Queen City"), by and through its undersigned legal counsel, hereby files this Complaint for Judicial Review against Defendant, Robert F. Kennedy, Jr., in his official capacity as the Secretary of the U.S. Department of Health and Human Services ("Secretary"), following the entry of an administrative order by the Medicare Appeals Council ("Council") as to Council docket number M-24-4103 and Office of Medicare Hearings and Appeals (OMHA) appeal number 3-12950483903, and in support thereof states as follows:

## PARTIES

1. Queen City is a limited liability company organized under the laws of the State of Ohio. Queen City's principal place of business is located at 4605 Duke Drive, Suite 220, Mason, OH 45040.

2. Robert F. Kennedy, Jr. is the Secretary of the U.S. Department of Health and Human Services (HHS) and the proper Defendant in this action pursuant to 42 C.F.R. §

405.1136(d)(1).

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 1395ff(b)(1)(A) (incorporating by reference 42 U.S.C. § 405(g)), which authorizes judicial review of the Secretary's final decision as to a Medicare reimbursement dispute such as this.

4. Venue is proper pursuant to 42 U.S.C. § 1395ff(b)(1)(A) because Queen City's principal place of business is located in this judicial district.

5. The amount in controversy exceeds the jurisdictional requirement set forth at 42 U.S.C. § 1395ff(b)(1)(E)(i).

6. This action has been initiated within 60 days of the Council's administrative order dated August 20, 2026, as required by 42 C.F.R. § 405.1132(b).

## MEDICARE COVERAGE OF HOSPICE SERVICES

7. Medicare is the federal health insurance program for the elderly and disabled established in 1965. The Medicare statute is codified at 42 U.S.C. § 1395 *et seq.*

8. The Medicare program is administered by the Centers for Medicare and Medicaid Services (CMS), which is an agency within HHS.

9. CMS engages with numerous private contractors to assist in the administration of the Medicare program. The types of contractors relevant to this matter include Medicare Administrative Contractors (MACs), Supplemental Medical Review Contractors (SMRCs), and Qualified Independent Contractors (QICs).

10. MACs perform numerous functions on behalf of CMS, including but not limited to claims processing, beneficiary and provider enrollment, adjudication of administrative claim

appeals, development of Medicare policies, and provider outreach and education. *See* 42 U.S.C. § 1395kk-1(a)(4).

11. SMRCs perform medical review audits of providers' claims on a post-payment basis to ensure those claims met all Medicare requirements for coverage and payment at the time they were submitted. *See* 42 U.S.C. § 1395ddd(a)-(b).

12. QICs conduct administrative claim appeals on behalf of CMS. *See* 42 U.S.C. § 1395ff(c).

13. Each CMS contractor is responsible for overseeing or assisting with Medicare program operations in a dedicated geographic area of the country. For example, the MAC with "jurisdiction" over hospice providers in Ohio, like Queen City, is Palmetto GBA ("Palmetto").

14. CMS explains the purpose and goals of hospice care as follows:

> Hospice care is an approach to caring for the terminally ill individual that provides palliative care rather than traditional medical care and curative treatment. Palliative care is an approach that improves the quality of life of patients and their families facing the problems associated with life-threatening illness through the prevention and relief of suffering by means of early identification, assessment and treatment of pain and other issues. Hospice care allows the patient to remain at home as long as possible by providing support to the patient and family, and by keeping the patient as comfortable as possible while maintaining his or her dignity and quality of life.

Medicare and Medicaid Programs; Hospice Conditions of Participation, 73 Fed. Reg. 32088, 32088 (June 5, 2008).

15. Medicare defines the term "hospice services" to include all services, medications, and equipment necessary for the palliation and management of a terminal condition. Hospice services may include, but are not limited to, physician services, nursing care, medical social services, spiritual counseling services, short-term inpatient care, and physical, occupational, and speech therapy. *See* 42 U.S.C. § 1395x(dd)(1); *see also* 42 C.F.R. § 418.3.

16. An individual is considered "terminally ill" when he or she has a life expectancy of six months or less if the illness runs its normal course. 42 U.S.C. § 1395x(dd)(3)(A).

17. Medicare covers reasonable and necessary hospice services furnished to eligible beneficiaries. To qualify for the Medicare hospice benefit, a beneficiary must elect to receive hospice care and be certified as terminally ill by a physician. 42 C.F.R. § 418.20.

18. Once a beneficiary elects to receive hospice services, the hospice medical director (and the beneficiary's attending physician, when so designated) must certify that the beneficiary is terminally ill.[1] The certification is based on the medical director's or physician's clinical judgment regarding the normal course of the patient's illness. 42 U.S.C. § 1395f(a)(7)(A).

19. Each hospice certification covers a designated benefit period. Beneficiaries are entitled to receive hospice services through two consecutive 90-day benefit periods followed by an unlimited number of 60-day benefit periods. *Id.* § 1395f(a)(7)(A). The hospice medical director and beneficiary's attending physician, if one has been designated, must execute a certification at the beginning of each certification period.[2] *Id.*

20. Certifications must also conform to various content and timeliness requirements established by CMS. Relevant here, the written certification must include a brief narrative explanation of the clinical facts that support the beneficiary's terminal prognosis. *Id.* § 418.22(b)(3).

21. For each recertification period, the hospice must obtain oral or written certification from the hospice physician 15 days prior to the beginning of the recertification period or 2 days

[1] An "attending physician" is the physician, nurse practitioner, or physician assistant whom the beneficiary identifies as having the most significant role in the determination and delivery of medical care to the individual at the time the individual makes an election to receive hospice care. 42 U.S.C. § 1395x(dd)(3)(B).

[2] The medical director and the beneficiary's attending physician must both execute the certification covering the first benefit period. The Medicare statute and CMS regulations only require the hospice medical director to execute each certification thereafter, although the beneficiary's attending physician may also participate in the subsequent certification processes. 42 U.S.C. § 1395f(a)(7)(A)(ii).

after the recertification period starts. Each recertification must also include a brief clinical narrative statement composed by the hospice physician that supports the beneficiary's terminal prognosis. *Id.* § 418.22(b)(3).

22. The Medicare statute and CMS regulations expressly recognize the pivotal role played by the hospice physician's clinical judgment with respect to hospice patient eligibility determinations. 42 U.S.C. § 1395f(a)(7)(A)(i); 42 C.F.R. § 418.22(b). In recognition of the pivotal nature of the hospice physician's discretion and clinical judgment in the patient eligibility determination process, CMS has previously considered and expressly declined to create specific criteria that would govern or constrain that clinical judgment. *See* Medicare and Medicaid Programs: Hospice Conditions of Participation, 73 Fed. Reg. 32088, 32138 (June 5, 2008).

23. Beginning with the third benefit period and continuing for each benefit period thereafter, a hospice physician or hospice nurse practitioner must conduct a face-to-face encounter with the beneficiary to perform an assessment and gather clinical evidence relevant to the beneficiary's terminal condition. 42 U.S.C. § 1395f(a)(7)(D). The face-to-face must occur prior to, but no more than 30 calendar days prior to, the beginning of each applicable recertification period. 42 C.F.R. § 418.22(a)(4)(i).

24. The physician or nurse practitioner who performs the face-to-face encounter must attest in writing that he or she had a face-to-face encounter with the patient, including the date of that visit. *Id.* § 418.22(b)(4). The hospice physician's narrative statement on a certification covering the third benefit period and each benefit period thereafter must include, among other things, an explanation of why the clinical findings from the face-to-face encounter support a life expectancy of six months or less. *Id.* § 418.22(b)(3)(v).

25. The only beneficiary eligibility requirement for hospice services set forth in the

Medicare statute and CMS regulations is that the beneficiary be terminally ill with a life expectancy of six months or less if the illness runs its normal course. *See* 42 U.S.C. § 1395x(dd)(1); 42 C.F.R. § 418.20.

26. CMS does not require that beneficiaries exhibit rapid decline in their conditions, unstable medical problems, or uncontrolled symptoms to be eligible for the Medicare hospice benefit. CMS also does not require that frequent changes be made to a beneficiary's plan of care in order to substantiate the need for hospice services. *See* Medicare Program; Hospice Wage Index for Fiscal Year 2010, 74 Fed. Reg. 39384, 39399 (Aug. 6, 2009) ("We acknowledge that not all patients will show measurable decline at the time of recertification.").[3]

27. In fact, CMS has acknowledged that a beneficiary can remain eligible for the Medicare hospice benefit if his or her condition is stable or even improves while receiving hospice care. Medicare Program; FY 2015 Hospice Wage Index and Payment Rate Update; Hospice Quality Reporting Requirements and Process of Appeals for Part D Payments for Drugs for Beneficiaries Enrolled in Hospice, 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014) (patient may, in view of "full clinical picture," be eligible for hospice even if his or her condition has stabilized or improved); Medicare Program; Home Health Prospective Payment System Rate Update for Calendar Year 2011; Changes in Certification Requirements for Home Health Agencies and Hospices, 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010) ("A patient's condition may temporarily improve with hospice care.").

28. Both Congress and CMS have recognized the inherent difficulty in prognosticating

[3] Palmetto, the MAC whose jurisdiction includes Ohio, has similarly released guidance to the hospice stakeholder community stating there is, "[N]o requirement that 'significant documented decline' must be included in the record [to substantiate Medicare coverage of hospice services]."). Palmetto GBA, *Hospice Coalition Questions and Answers*, at 3–4 (Sept. 23, 2008), *available at* https://www.yumpu.com/en/document/read/41131953/september-23-2008-hospice-coalition-questions-palmetto-gba/3 (last accessed October 15, 2026).

life expectancy. *See* Medicare Benefit Policy Manual (MBPM) Ch. 9 § 10 (CMS IOM Pub. 100-02, Rev. 246) (2018) ("Predicting life expectancy is not always exact."); 79 Fed. Reg. at 50470 ("[W]e also have recognized the challenges in prognostication" and therefore expect "that the certifying physicians will use their best clinical judgment."); Medicare Program; Hospice Care Amendments, 67 Fed. Reg. 70363, 70364 (Nov. 22, 2002) (noting that Congress removed the 210-day hospice benefit period cap originally enacted in 1982 due to "the scientific difficulty in making a prognosis of six months or less.").

29. CMS has developed various subregulatory guidance documents, such as the MBPM, that elaborate on and clarify coverage and payment rules set forth in Medicare regulations.

30. MACs also create Medicare coverage policies on behalf of CMS. These documents are called Local Coverage Determinations ("LCDs"). LCDs are guidance documents respecting whether a particular service or item is considered medically reasonable and necessary throughout the MAC's jurisdiction.[4] 42 U.S.C. § 1395ff(f)(2)(B).

31. Palmetto has promulgated several LCDs that are relevant to the hospice services furnished to beneficiaries with specific terminal illnesses, including L34547 ("Hospice – Neurological Conditions"), L34548 ("Hospice – Cardiopulmonary Conditions"), and L34567 ("Hospice – Alzheimer's Disease and Related Disorders"). These LCDs set forth guidelines for hospice providers to utilize in determining and documenting whether a beneficiary is terminally ill.

32. The LCDs relevant to this case contain recommended guidelines for establishing medical necessity of hospice services, as evidenced by the MAC's use permissive language, such

---

[4] Some provisions of the Medicare statute use the outdated terms "fiscal intermediary" and "carrier," which were the predecessor entities to MACs.

as "should" and "may," as opposed to mandatory language (words such as "shall" and "must"), throughout each policy.

33. For example, L34567 states in relevant part: "Alzheimer's Disease (AD) and related disorders may support a prognosis of six months or less under many clinical scenarios. The identification of specific structural/functional impairments, together with any relevant activity limitations, ***should*** serve as the basis for palliative interventions and care planning." (emphasis added). The LCD goes on to provide that, "Ultimately, the combined effects of the AD…and any comorbid [or secondary] condition ***should*** be such that ***most*** beneficiaries with AD…and similar impairments would have a prognosis of 6 months or less." (emphasis added). The LCD then concludes: "For beneficiaries with AD to be eligible for hospice, the individual ***should*** have [advanced Alzheimer's Disease] and specific comorbid or secondary conditions meeting the above criteria." (emphasis added). L34547 and L34548 contain similarly permissive language.

34. The LCDs are one path to documenting and establishing beneficiary eligibility for hospice services. As each LCD acknowledges, a beneficiary can be eligible for hospice services based on a certain condition or diagnosis "under many clinical scenarios."

35. A beneficiary is discharged from hospice when he or she passes away, revokes his or her hospice election (if, for example, he or she wishes to pursue curative treatment for the terminal illness), wishes to transfer to a different hospice provider, or moves outside of the hospice's designated service area. 42 C.F.R. § 418.26.

36. Although hospice physicians must execute certifications covering benefit periods that are 90 days and 60 days in length, CMS requires that claims for hospice services be billed in monthly increments. Medicare Claims Processing Manual (MCPM) Ch. 11 § 90 (CMS IOM Pub.

100-04, Rev. 3502) (2016).[5]

**MEDICARE CLAIM AUDITS AND APPEALS**

37. In the event a CMS contractor, such as a SMRC, denies a Medicare claim on a post-payment basis, then the provider is responsible for repaying any overpayment associated with the denied claim(s).

38. Providers who are dissatisfied with an adverse claim determination may contest that decision through a four-step administrative appeals process. *See* 42 U.S.C. § 1395ff(b).

39. The four steps in CMS' administrative claim appeal process are redetermination, reconsideration, a hearing before an Administrative Law Judge ("ALJ"), and review by the Council.

40. Requests for redetermination are processed by MACs. Requests for reconsideration are handled by QICs. Hearing requests are adjudicated by ALJs within OMHA. The Council, which often renders final decisions concerning Medicare reimbursement disputes on behalf of the Secretary, is a part of the HHS Secretary's office.

41. A redetermination consists of an independent review of an initial claim determination. During the redetermination process, the MAC reviews the evidence and findings upon which the initial determination was based along with any additional evidence submitted by the provider. The MAC then issues a decision affirming or reversing (in whole or in part), the initial determination in question. 42 C.F.R. §§ 405.948, 405.954. A provider that is dissatisfied with a redetermination decision may seek review of that decision by the QIC.

42. A reconsideration consists of an independent, on-the-record review of an initial determination and redetermination. The QIC will review the evidence and findings upon which

[5] For example, if Ms. Smith elected hospice care on April 20 and lived through at least the month of May, the hospice's first Medicare claim would cover dates of service from April 20 to April 30. The hospice's second (separate) claim would then include dates of service May 1 through May 31.

the initial determination and redetermination were based along with any additional evidence submitted by the appellant. The QIC's decision must contain, among other things, an explanation of how pertinent laws, rules, and regulations apply to the case as well as the medical and/or scientific rationale for the decision. 42 C.F.R. §§ 405.968(a)(1), 405.976(b). An appellant that is dissatisfied with a reconsideration decision may seek review of that decision by an ALJ.

43. The ALJ hearing is the appellant's only opportunity to present its case in real time to an adjudicator. ALJ hearings are usually conducted via telephone. The appellant may present written statements about the facts and law relevant to the case, offer witness testimony, and make arguments regarding the issues in the case. 42 C.F.R. §§ 405.1020(b)(2), 405.1032(a), 405.1036(a)-(e); *see also* Medicare Program: Changes to the Medicare Claims and Entitlement, Medicare Advantage Organization Determination, and Medicare Drug Coverage Determination Appeals Procedures, 82 Fed. Reg. 4974, 5049 (Jan. 17, 2017) ("A primary function of the ALJ hearing is to allow the parties to present arguments and testimony, and to allow the ALJ to ask questions in order to provide the ALJ with the necessary information to make the findings of fact and conclusions of law in rendering a decision consistent with the applicable authorities.").

44. ALJs review cases *de novo*. ALJs are not bound by CMS subregulatory guidance documents or LCDs but may give substantial deference to those policies in cases where they are applicable. 42 C.F.R. §§ 405.1000(d), 405.1062(a). If an ALJ declines to follow a particular policy, he or she must explain the reason(s) why in the decision. *Id.* § 405.1062(b).

45. During the hearing and in rendering a decision, the ALJ considers all issues that were brought out in the initial determination, redetermination, and reconsideration that were not decided entirely in the appellant's favor. *Id.* § 405.1032(a).

46. An ALJ may consider a new issue, but to do so he or she must find that (1) the new

issue could have a material impact on the claim or other appealed matter; and (2) the evidence considered in making the lower-level determination(s) clearly shows on its face that an obvious error was made. *Id.* § 405.1032(b)(1)(ii). ALJs must notify appellants of any new issues that will be considered in advance of the hearing. *Id.* § 405.1032(b)(2).

47. The administrative record before the ALJ consists of all evidence used in the initial determination, redetermination, and reconsideration processes as well as the evidence offered at the hearing or otherwise admitted into the record by the ALJ. Hearing decisions must contain, among other things, independent findings of fact and conclusions of law. 42 C.F.R. §§ 405.1042, 405.1046(a)(1). An appellant that is dissatisfied with an ALJ's decision may seek further administrative review by the Council.

48. The Council is responsible for conducting *de novo* reviews of ALJ decisions. The Council is generally required to issue a decision within 90 days of receiving a request for review. 42 U.S.C. § 1395ff(d)(2). In the event the Council is unable to adjudicate an appeal within 90 days of receipt, the appellant may file a request to "escalate" its appeal to federal court. Within five days of receiving an appellant's escalation request, the Council must either render a decision or confirm it is unable to issue a decision and permit the appellant to seek review in federal court. *Id.* § 1395ff(d)(3)(B); 42 C.F.R. § 405.1132.

49. In a case where a provider escalates an appeal pending before the Council to federal court, the ALJ's decision becomes the Secretary's final decision for purposes of judicial review. *See, e.g., Ashli Healthcare, Inc. v. Becerra*, 2024 WL 389104, at *1 (E.D. Cal. August 21, 2024).

**LIABILITY FOR NON-COVERED SERVICES AND WAIVER OF OVERPAYMENTS UNDER THE MEDICARE STATUTE**

50. The Medicare statute contains special rules for evaluating whether an appellant should be held financially liable for non-covered services or if recoupment of an overpayment may

be waived.

51. The law allows for limitation on an appellant's liability for non-covered services in cases where the appellant did not know, nor could it reasonably have been expected to know, that payment would not be made for the denied services. This statutory limitation on liability applies where services have been denied because they were not medically reasonable and necessary. 42 U.S.C. § 1395pp(a)(1).

52. CMS regulations and guidance contain various criteria to apply when evaluating whether an appellant's liability should be limited in connection with non-covered services. The applicable regulation requires analysis of the following:

> [Whether] [i]t is ***clear*** that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage on the basis of the following: [i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guidelines or directives from intermediaries, carriers…; Federal Register publications containing notice of national coverage decisions or of other specifications regarding noncoverage of an item or service; or [i]ts knowledge of what are considered acceptable standards of practice by the local medical community.

42 C.F.R. § 411.406(e) (emphasis added). The Medicare Claims Processing Manual (MCPM) similarly provides that, "When the medical records ***clearly*** show that the beneficiary received only non-covered services as described in the Medicare Benefit Policy Manual, the healthcare provider or supplier will be presumed to have knowledge of non-coverage." MCPM Ch. 30 § 30.2.2 (Pub. 100-04, Rev. 4197) (2019) (emphasis added). In addition, an adjudicator must assess whether the appellant's interpretation of the applicable coverage guidelines was reasonable as to each claim or service under review. *In Home Health, LLC v. Kennedy*, 184 F.4th 499, 509-10 (6th Cir. 2026).

53. Waiver of liability under 42 U.S.C. § 1395pp is appropriate where the meaning of a particular coverage standard is "far from obvious or obviously correct" or CMS has applied an "improper standard" in its coverage decisions. *See Caring Hearts Pers. Home Servs. v. Burwell*,

824 F.3d 968, 972 (10th Cir. 2016) (Gorsuch, J.); *Cypress Home Care, Inc. v. Azar*, 326 F.Supp.3d 307, 316 (E.D. Tex. 2018).

54. The statute also allows for waiver of recovery of an overpayment to an appellant in cases where the appellant was "without fault" with respect to the creation of the overpayment. 42 U.S.C. § 1395gg(b); *see also* 42 C.F.R. § 405.355(a); Medicare Financial Management Manual (MFMM) Ch. 3 § 70.3 (Pub. 100-06, Rev. 294) (2017). Overpayments assessed for any reason—not just those based on an alleged lack of medical necessity—are subject to waiver under this statutory mechanism.

55. CMS manual guidance sets forth several examples of situations in which appellants will be at fault for causing an overpayment, such as where the appellant received Medicare payment for services that it should have known were non-covered. MFMM Ch. 3 § 90.1(H).

56. The CMS guidance governing waiver of recoupment incorporates by reference the criteria set forth in Chapter 30 of the MCPM for determining when an appellant knew or should have known that certain items or services would be non-covered. MFMM Ch. 3 § 90.1(H)(2). The constructive knowledge standards for determinations under 42 U.S.C. §§ 1395pp and 1395gg(b) are thus, in effect, identical.

## FACTUAL AND PROCEDURAL BACKGROUND

57. At all times relevant hereto, Queen City was a Medicare-certified provider of hospice services. Queen City provides high-quality hospice services to the residents of the greater Cincinnati, Ohio area, many of whom are Medicare beneficiaries.

58. At all times relevant hereto, Noridian Healthcare Solutions, LLC ("Noridian") was a SMRC operating under contract with CMS.

59. In December 2021, Noridian provided notice of its intent to conduct a post-payment

audit of certain hospice services billed by Queen City to the Medicare program from 2018 to 2021. The audit covered almost 400 claims for services rendered to 10 different Medicare beneficiaries. Queen City submitted copies of its medical records to the SMRC as requested.

60. In subsequent correspondence dated May 17, 2022, Noridian alleged that approximately 72% of the claims under review failed to meet Medicare coverage criteria and should not have been reimbursed. The SMRC therefore stated that Queen City had received Medicare overpayments totaling $1,172,844.

61. Upon receipt of the initial overpayment determination, Queen City promptly filed requests for redetermination with Palmetto in September and October 2022 contesting the adverse claim decisions. In a partially favorable notice of redetermination dated November 30, 2022, the MAC reversed approximately one dozen unfavorable claim determinations but otherwise agreed with Noridian's overpayment findings.

62. Queen City then sought reconsideration with the QIC, Maximus Federal Services, Inc. ("Maximus"). On or around September 1, 2023, Maximus rendered a partially favorable reconsideration decision that reversed approximately 40 claim denials and upheld the remaining unfavorable determinations.

63. On October 31, 2023, Queen City requested a hearing before an ALJ to challenge the unfavorable aspects of the QIC's reconsidered determination.

64. The ALJ to whom the case was assigned conducted a pre-hearing conference on January 12, 2024. During the pre-hearing conference, the ALJ and counsel for Queen City discussed a variety of issues related to the nature and format of the upcoming evidentiary hearing. At one point, counsel commented that Queen City intended to call as witnesses two highly credentialed, independent hospice physicians to offer their respective opinions as to why the

documentation supported that the beneficiaries were terminally ill during the relevant dates of service. In response, the ALJ made a statement to the effect of, "Quite frankly, I'm not interested in their opinions." The ALJ went on to state that the only opinion that mattered in the case was his own.

65. The ALJ held an evidentiary hearing by telephone on April 18, 2024. Queen City was represented by counsel and presented legal arguments along with clinical testimony from Drs. Christopher Jones and Ruth Thomson. Dr. Jones is a Professor of Medicine at Duke University Medical School and teaches in the areas of geriatrics and palliative care. Dr. Thomson is the Chief Medical Officer of a large, not-for-profit hospice. Both physicians have decades of experience in hospice care and are board-certified in hospice and palliative medicine and hold hospice medical director credentials.

66. During the hearing, the ALJ raised a new issue concerning the sufficiency of the physician certifications that had not been raised during any prior levels of administrative review. The ALJ did not provide notice of this new issue to Queen City in advance of the hearing. Queen City submitted a post-hearing position paper to the ALJ on May 17, 2024 addressing that issue.

67. On June 13, 2024, the ALJ issued an unfavorable decision. The ALJ's decision upheld all unfavorable aspects of the QIC's reconsidered determination on the bases that: (1) none of the hospice certifications at issue complied with CMS regulations; and (2) the documentation did not support that the beneficiaries were terminally ill.[6] The ALJ found that Queen City was financially responsible for the non-covered services.

68. The ALJ's decision was riddled with general errors as well as flaws in his analyses of the individual claims for hospice services.

---

[6] The ALJ also dismissed part of the appeal as to certain claims based upon Queen City's request. *See* 42 C.F.R. § 405.1052(c). The dismissed claims are not included as part of this Complaint.

69. Federal regulations require ALJs to render decisions based upon evidence offered at the hearing or otherwise admitted into the record. 42 C.F.R. § 405.1046(a)(1). Although the ALJ summarized the testimony offered by Drs. Jones and Thomson during the hearing, he never explained why he rejected that testimony as not relevant or credible. *Cf.* 82 Fed. Reg. at 5049 (observing that ALJs have a responsibility to consider all "necessary testimony" when rendering decisions). Federal agency adjudicators are not required to address each piece of evidence in a record when issuing a decision, but the testimony offered by Queen City's expert witnesses was central to its case given the importance of the physician's clinical judgment in assessing beneficiary eligibility for hospice services under the Medicare statute. *See* 42 U.S.C. § 1395f(a)(7)(A)(i); *see also Hospice of E. Tex. v. Sec'y. of U.S. Dep't. of Health and Hum. Servs.*, 2025 WL 1062504, at *23-24 (E.D. Tex. Feb. 21, 2025) (reversing unfavorable agency decision based in part on the ALJ's failure to adequately explain reasons for rejecting the hospice physicians' medical opinions).

70. The ALJ's decision also does not reflect that he performed a *de novo* review of all claims under appeal, nor does it corroborate that he developed independent findings of fact and conclusions of law based on the evidence in the administrative record. *See* 42 C.F.R. § 405.1046(a). The reason for this is because several aspects of the ALJ's coverage decisions are identical to findings from the MAC and QIC decisions. In many cases, the ALJ copied verbatim the language used by the contractors in their respective decisions while making only slight modifications to style or format. *Cf. In the Case of Beacon Behavioral Health – Baton Rouge*, 2011 WL 7145599, at *6-7 (H.H.S. 2011) (Council vacating an ALJ decision because the ALJ's claim determinations merely duplicated those of the lower-level reviewers).

71. For instance, the MAC stated the following in its decision with respect to the claims

for beneficiary L.O.:

> The documentation for the dates of service under review recorded stable vital signs; lungs were clear and diminished bilaterally, oxygen use as needed with oxygen saturations ranging between 90-98% on room air. She was incontinent of bowel and bladder. Her skin was dry and intact. She had no uncontrolled non-verbal indicators of pain. Her appetite was noted as fair to good, consuming 25-50% of a pureed diet due to dysphagia. There was no documented weight loss or decrease in MAC (mid-arm circumference) during the episode under review. She had noted cachexia and temporal wasting. She was oriented to person only, confused, mostly non-verbal and unable to make needs known. She exhibited word salad at times. She had intermittent agitation and would grind her teeth. She had contractures of bilateral upper and lower extremities, was bed to Broda chair bound and required total assistance with activities of daily living. She was noted to sleep “20+” hours per day. The documentation reported a PPS (Palliative Performance Scale) score of 30% documented on July 01, 2020. The documentation for the dates of service under review did not support any significant decline.
>
> Although the documentation supported beneficiary as debilitated, it did not support significant changes requiring frequent medication adjustments or changes to the plan of care. The beneficiary appeared to be chronic and not end stage Alzheimer’s disease. In addition, the documentation submitted did not support that the beneficiary met the Medicare criteria concerning comorbid and secondary conditions. There was no documentation submitted to support the beneficiary suffered from any exacerbations of comorbid conditions affecting a terminal outcome within six months.

For the same beneficiary, the QIC found in part that:

> **In this case, the medical records do not demonstrate that the beneficiary’s current condition supports a life expectancy of six months or less. There were no stage three or greater pressure ulcers, no recurrent systemic infections, no signs and symptoms of aspiration pneumonia, and a significant weight loss was not supported. The care that the beneficiary received appeared to be for a chronic rather than a terminal condition.**

The ALJ’s decision for this beneficiary then contains the following passage:

> On readmission, the Beneficiary had stable vital signs, lungs were diminished, had no oxygen use with oxygen saturations ranging between 89-99% on room air, she was incontinent of bowel and bladder, her skin was warm, dry, and intact, and she had no uncontrolled non-verbal indicators of pain. Her appetite was noted as fair to good, she consumed a pureed diet, she was oriented to person only, confused, and non-verbal, she had contractures of bilateral upper and lower extremities, and was bed to Broda chair bound and required total assistance with ADLs.
>
> **In this case, the medical records do not demonstrate that the Beneficiary’s condition supported a life expectancy of six months or less. There were no stage three or greater**

> **pressure ulcers, no recurrent systemic infections, no signs and symptoms of aspiration pneumonia, and a significant weight loss was not supported…**
>
> **The care that the Beneficiary received appeared to be for a chronic rather than a terminal condition.** Although the documentation supported a chronically ill and debilitated individual, there was not sufficient documentation of clinical findings to support significant decline indicating a prognosis of six months or less. Additionally, the documentation submitted did not support that the Beneficiary met the Medicare criteria concerning comorbid and secondary conditions. Although the documentation supported a chronically ill individual in need of custodial care, there was insufficient clinical information, and no other documentation submitted, to support the Beneficiary suffered from any exacerbations of comorbid conditions affecting a terminal outcome within six months.

A comparison of the underlined passages from the MAC's decision and the ALJ decision and the bolded passages from the QIC's decision and the ALJ's decision confirms that the ALJ did not perform a *de novo* review or make independent findings of fact or conclusions of law with respect to beneficiary L.O.

72. As another example, the redetermination decision for beneficiary M.R. states in relevant part:

> Upon review, the submitted documentation indicated the beneficiary was oriented "x 2-3", forgetful and confused and lethargic at times. Vital signs were within normal ranges for the beneficiary. Her lungs sounds were diminished bilaterally, expiratory wheezing, shortness of breath with minimal exertion, use of accessory muscles, heart rate regular with oxygen saturations ranging between of 92-96% on 2-2.5 liters via nasal cannula. She had chronic generalized pain and pain in left lower extremity, back, hip and right shoulder, rated at 3-9/10. She utilized Methadone twice daily and Dilaudid as needed for pain. She had cyanosis and "2+" edema to bilateral lower extremities. She was incontinent of bladder. Her appetite was poor to fair, consuming 25-50% of meals. Her weight decreased from 145 to 140 pounds in the last month. She required total assistance with ADL's (activities of daily living) but was able to feed herself. She was only able to ambulate 5-10 feet with walker. She had weakness, impaired balance with an abnormal gait, limited mobility and range of motion and was mainly chairbound. She had a history of multiple falls and fractures. The documentation reported a PPS (Palliative Performance Scale) score of 40% documented on February 17, 2021. There were no frequent medication adjustments to control end of life symptoms. She appeared to be chronic with no significant decline indicating a prognosis of six months or less.
>
> In addition, the documentation submitted did not support that the beneficiary met the Medicare criteria concerning comorbid and secondary conditions. There was no

> documentation submitted to support the beneficiary suffered from any exacerbations of comorbid conditions affecting a terminal outcome within six months. As a result, twenty-eight hospice routine care days remain denied as documentation did not support hospice services as reasonable or necessary.

The ALJ's decision for beneficiary M.R. states in relevant part:

> Further, the record throughout the DOS at issue generally indicated the Beneficiary was alert and oriented times two or three, was forgetful and confused and lethargic at times, and vital signs were within normal range for the Beneficiary. She had chronic, generalized pain and pain in left lower extremity [sic], back, hip, and right shoulder, rated 3-10/10. She managed her chronic pain with pain medication, and by December 2019, she utilized Methadone and Dilaudid as needed. Her appetite ranged from poor to fair, consuming 25-50% of meals. She required total assistance with ADL's but was able to feet herself. She was only able to ambulate short distances with a walker. She had weakness, impaired balance with an abnormal gait, limited mobility and range of motion, and was mainly chairbound. She had a history of multiple falls and fractures. Although there were some mentions of a urinary tract infection and respiratory infection, they were treated with antibiotics. Finally, there were no frequent medication adjustments to control end of life symptoms.
>
> Based on the foregoing, the documentation supported a chronically ill and debilitated individual, however, there was not sufficient documentation of clinical findings to support significant decline indicating a prognosis of six months or less. Additionally, the documentation submitted did not support that the Beneficiary met the Medicare criteria concerning comorbid and secondary conditions. Although the documentation supported a chronically ill individual in need of custodial care, there was insufficient clinical information, and no other documentation submitted, to support the beneficiary suffered from any exacerbations of comorbid conditions affecting a terminal outcome within six months.

A comparison of the underlined sentences demonstrates that, once again, the ALJ copied significant parts of his decision from the notice of redetermination. The ALJ even duplicated some of the MAC's grammatical errors, such as omitting a definite article from the phrase "she had chronic generalized pain and pain in left lower extremity" and incorrectly using an apostrophe in "ADLs." Although the ALJ otherwise modified some of the language and included one or two additional sentences addressing additional facts, that hardly rises to the level of a *de novo* review or independent decision-making.

73. The ALJ also plainly erred in finding that almost every physician certification in

this case was invalid. The ALJ incorrectly determined that the certifications did not meet Medicare requirements because they purportedly failed to contain explanations of why the findings from the corresponding face-to-face encounters supported the beneficiaries' eligibility for hospice care. *See* 42 C.F.R. § 418.22(b)(3)(v). There are four problems with this conclusion.

74. *First*, OMHA regulations require ALJs to provide advance notice to appellants when they intend to raise new issues during a hearing. *Id.* § 405.1032(b)(2). The ALJ issued no such notice in this case. Moreover, the ALJ failed to explain in his decision how resolution of this new issue would have a material impact on the claims or other appealed matters under consideration and whether the evidence considered in making the determinations below showed on its face that an obvious error was made. *Id.* § 405.1032(b)(1)(ii).

75. *Second*, Queen City submitted a post-hearing position paper to the ALJ addressing this new issue and included relevant subregulatory guidance issued by CMS. This guidance contained examples of hospice physician certification narratives that CMS deemed acceptable and did not contain the language that the ALJ incorrectly believed was mandated under the regulation. The ALJ ignored this guidance, however, because it contained a disclaimer stating that it did not carry the force of law. But this is true of all subregulatory guidance.[7] The ALJ did not otherwise explain in his decision why he chose not to defer to the CMS guidance document, as required by 42 C.F.R. § 405.1062(b).

76. *Third*, the ALJ's factual findings that the physicians failed to discuss the clinical findings from the face-to-face encounter in their certification narratives as to most cases were flatly incorrect. For example, the certification documents as to the vast majority of benefit periods at

[7] The ALJ cited and relied on other subregulatory guidance documents, such as LCDs and the MBPM, in his decision even though those authorities, like the guidance referenced by Queen City, do not enjoy the force of law. *See* 42 C.F.R. § 405.1062(a).

issue contain the following statements directly above the physician narratives: "Review the patient's clinical circumstances and synthesize the medical information to provide clinical justification for admission and continuation to hospice services. ***If in third (3rd) or more benefit periods, clinical findings from the face to face encounter have been used to determine continued eligibility for hospice care.***" (emphasis added). This demonstrates that, contrary to the ALJ's findings in most instances, that the physicians considered the findings from the face-to-face encounters when executing their hospice certifications.

77. *Fourth*, the physicians who completed the purportedly invalid hospice certifications all composed narratives that included clinical facts that were similar or, in many cases, identical to the clinical findings from the corresponding face-to-face encounters. For example, the hospice physician composed the following narrative for the benefit period December 30, 2018 to February 27, 2019 for beneficiary M.C.:

> Patient is a 75 year old African American female with terminal diagnosis of Alzheimer's Disease entering her 5th benefit period. Patient is alert to name only, word salad, nonsensical speech, unable to carry on a conversation. Patient with chin to chest posture, will occasionally look up, eye contact is poor. Patient constantly fidgeting and picking at clothes, and anything else within reach. Patient with increase in resistance to care and combativeness requiring scheduled Lorazepam BID and use of PRN Lorazepam gel. Patient has displayed new behavior, such as eating non-food items like plastic, paper, napkins, and drinking creamers/condiments off of the table. She's had an increase in pocketing food and needing cues to swallow. She is now using a divided plate and is taking approximately 45min-1 hour to feed self pureed diet. Patients current weight is 129.8#, she's had a -24.8# weight loss since admission 3/2018. Patient requires 4-5/6 ADL assist and is incontinent of bowel and bladder. PPS 40% and FAST has changed from a 7A to 7B since last recertification. She is appropriate for hospice.

The physician who performed the face-to-face encounter documented the following clinical findings:

> **Comments**
> 75 y/o female patient with a terminal dx of Alzheimer's disease entering her 5th benefit period was seen and evaluated today for re-certification purposes. Per RN CM patient with a continued functional and cognitive decline, PPS 40%, FAST has declined, now a 7B as evidenced by very speech limited to 1-2 words, extensive disease and inability to perform any work. Patient able to ambulate, gait unsteady. RN CM reports patient has now begun to eat non food items such as plastic and paper which is new for this patient. Requires assist with 6/6 ADLs as she is now requiring increased cueing with meals due to pocketing but remains able to feed self slowly a pureed diet. Patient is appropriate for continued hospice services.

A comparison of these two passages substantiates that the certifying physician relied on almost the exact same clinical findings that were documented following the face-to-face encounter when concluding that M.C. was terminally ill.

78. As another example, the certifying physician composed the following narrative as part of the certification for beneficiary L.O. for dates of service November 7, 2019 to January 5, 2020:

> Patient is a 64 year old female with a terminal diagnosis of Alzheimer's disease.PPS of 30%. Fast of 7F, Patient is dependent in 6/6 ADLs and is unable to make needs known. Patient is unable to engage in conversation or make eye contact for any length of time, at times she is unaware of when someone is speaking to her but will intermittently alert to name. Current height is 59 inches and MAC noted of 15.5 cm to right arm. Weight loss continues despite staff reports of good appetite (50-100% of each meal). Patient is on Purée diet with thin liquids and tolerates well at this time. Patient presents emaciated and abdomen is concave in appearance. Patient sleeps approximately 18-20 hours per day per staff observation. Patient is bed to chair existence with one person assist. Patient noted to have poor trunk control and utilizes BRODA chair, often she places herself in fetal position. On 10/11/19 pt was noted to have skin breakdown to right hip in the form of two stage one pressure areas. Gel cushion placed to seat of BRODA chair to promote skin integrity. She remains incontinent of bowel and bladder. Patient has tight and ridged muscle tone to BUE and BLE as well as back and neck. Intermittent muscle twitching noted to BUE and BLE. Patient consistently grinds teeth with cares and any type of stimulation. STNA visits increased to 5x /week due to continued decline and Tylenol increased to TID for pain control in which a decrease in teeth grinding has been noted. Patient remains appropriate for continued hospice services.

The hospice nurse practitioner who completed the face-to-face encounter for the benefit period covered by the above-referenced certification documented the following findings:

> **Comments**
> 64 y/o Caucasian female on service with a terminal diagnosis of Alzheimer's disease now entering her 11th BP was seen and evaluated today with RN CM Emileigh, for recertification purposes. PPS 30%, patient has extensive disease, is severely debilitated and unable to preform any work requiring max assist with 6/6 ADLs. Mostly lethargic, patient will sleep unless engaged for meals and personal care. House caregiver reports her appetite is fair, spoon fed a pureed diet. MAC 15.5cm, was 14cm last certification period, however, there was a different RN CM measuring. Caregiver reports constipation, will add in Colace 100mg cap QD. RN CM reports worsening redness to boney prominences on hips and pelvic area, gel cushFAST 7F, patient is non-verbal, mostly lying in bed or broda, lacks ability to smile. On exam patient is up in broda resting with OU closed. She awakens to my voice, makes brief eye contact then closes again. She is unaware of her surroundings, unable to make her needs known. On exam patient is cachexic with generalized muscle wasting, atrophy/rigidity of bilateral upper and lower extremities. Patient will often grind her teeth, however, scheduled Tylenol has helped decrease the episodes. Respiratory rate is easy, lung sounds clear over diminished. HR RRR, SEM noted, no edema noted. Abdomen is concave, BS hypoactive. No objective s/sx of pain. No recent infections or falls. DNRCC. Patient remains appropriate for continued hospice care.

Once again, even a cursory comparison of these two passages demonstrates that the certifying physician utilized the same or similar clinical facts that were documented in the face-to-face record when attesting that L.O. was terminally ill in accordance with Medicare guidelines.

79. The ALJ clearly elected to defer to the pertinent LCDs but improperly applied them as though they were binding or mandatory in nature. For example, the ALJ found that almost every beneficiary was purportedly ineligible for hospice services because he or she "did not meet Medicare criteria concerning comorbid or secondary conditions." The ALJ failed to acknowledge that those criteria are *not* required to establish hospice eligibility or that, as each LCD states, beneficiaries may be eligible for hospice care under clinical scenarios not outlined in the LCD.

80. The ALJ even went so far as to improperly apply LCDs from other jurisdictions to this case. For example, at the end of his analysis of virtually every beneficiary's case, the ALJ remarked that the records purportedly failed to contain evidence of stage three or greater pressure ulcers, recurrent systemic infections, signs and symptoms of aspiration pneumonia, and/or significant weight loss. These clinical criteria are set forth in hospice LCDs promulgated by other MACs that do not apply to providers, like Queen City, located in Ohio.[8] *Cf.* 42 U.S.C. § 1395ff(f)(2)(B) (defining an LCD as a policy determination respecting whether a particular item or service is covered on a *contractor-wide* basis).

81. The claim examples discussed in the preceding paragraphs are reasonably representative of the issues and flaws that permeate the ALJ's decision.

82. Following his analysis of the claims under review, the ALJ found that Queen City did not qualify for a limitation or waiver of liability under the relevant provisions of the Medicare statute.

---

[8] *See* National Government Services, Local Coverage Determination L33393, at 6-7 (identifying the same clinical factors cited by the ALJ in his decision); CGS Administrators, Local Coverage Determination L34538, at 4-5 (same).

83. With respect to liability under 42 U.S.C. § 1395pp, the ALJ stated that Queen City had constructive knowledge of "various publications and issuances pertaining to Medicare guidelines." As a result, Queen City "had knowledge and is expected to know that the services would be excluded from Medicare [coverage]."

84. The ALJ's analysis as to § 1395pp is flawed because, among other reasons, constructive knowledge alone is insufficient to defeat a limitation of liability claim under the statute. If that was the case, then no Medicare provider would ever qualify for such a limitation because all providers are charged with constructive knowledge of the relevant laws, rules, and regulations. The ALJ also failed to analyze whether it was *reasonable* for Queen City to believe that its services would be covered by Medicare. *Cf. In Home Health*, 184 F.4th at 509-10.

85. The ALJ also found that the alleged overpayments could not be waived pursuant to 42 U.S.C. § 1395gg(b) because Queen City "had sufficient information to know its claim [sic] likely would not be covered under Medicare Part A."

86. Because the knowledge standards used for limitation of liability under § 1395pp and waiver of liability under § 1395gg(b) are the same, the ALJ's waiver analysis is also indelibly flawed because he failed to consider whether it was *reasonable* for Queen City to believe that, for example, its physician certifications were valid based upon the available CMS guidance.

87. On August 13, 2024, Queen City filed a request for the Council to review the ALJ's decision.

88. On August 6, 2026, Queen City submitted a request to the Council to escalate its pending appeal to federal court.

89. On August 20, 2026, the Council issued an administrative order confirming that it was unable to timely adjudicate Queen City's request for review. The Council's order confirmed

that Queen City was entitled to escalate its appeal to federal court.

90. The ALJ's decision is the final agency decision in this matter pursuant to 42 U.S.C. § 1395ff(b)(1)(A). Queen City has thus exhausted its administrative remedies, and this case is eligible for judicial review.

**COUNT I – INCORRECT LEGAL STANDARDS**

91. Queen City hereby incorporates by reference paragraphs 1 through 90 herein.

92. The ALJ has not correctly applied the relevant legal standards governing Medicare claim appeal procedures, Medicare coverage of hospice services, and liability for non-covered services under the relevant provisions of the Medicare statute.

93. The administrative record does not support that the ALJ performed the requisite independent, *de novo* review of the issues and evidence in this case or that he complied with agency procedures for noticing and considering new issues.

94. The ALJ incorrectly interpreted and applied Medicare rules governing hospice certifications to each and every claim under appeal.

95. The ALJ did not properly apply the relevant LCDs to the claims under review because he treated those permissive coverage guidelines as though they were mandatory and binding in nature. *Cf. Albert v. Burwell*, 118 F.Supp.3d 505 (E.D. N.Y. 2015) (reversing Medicare coverage decision for misapplying permissive LCD guidelines). The ALJ also considered and utilized coverage standards that are not found in any applicable law, rule, or regulation.

96. The ALJ's coverage determinations are also legally erroneous because they do not accord sufficient weight to the clinical judgment exercised by the certifying hospice physicians or the expert testimony of Drs. Jones and Thomson. *Cf. Hospice of E. Tex.*, 2025 WL 1062504, at *23-24.

97. The ALJ's analysis as to Queen City's liability under the relevant provisions of the Medicare statute was flawed because he incorrectly believed that constructive knowledge of Medicare coverage guidelines by itself was sufficient to defeat claims for a limitation or waiver of liability. The ALJ also failed to consider whether Queen City's interpretation of the relevant coverage standards was reasonable as to each claim under appeal. *Cf. In Home Health*, 184 F.4th at 509-10.

**COUNT II – LACK OF SUBSTANTIAL EVIDENCE**

98. Queen City hereby incorporates by reference paragraphs 1 through 90 herein.

99. The ALJ's coverage decisions are unsupported by substantial evidence because the medical records establish that the beneficiaries were terminally ill in that their life expectancies were six months or less if their illnesses ran the normal course.

100. No reasonable mind would accept the evidence cited by the ALJ in his unfavorable coverage decisions as sufficient to support the conclusion that the corresponding hospice claims are not covered by Medicare.

101. In reaching his unfavorable coverage determinations, the ALJ failed to appropriately consider evidence that fairly detracted from his decisions.

102. The ALJ's analysis of the hospice certifications was not supported by substantial evidence because the medical records contain clear evidence that the clinical findings from the face-to-face encounters were considered by the hospice physicians when composing their brief narrative statements. *See* 42 C.F.R. § 418.22(b)(3)(v). The ALJ did not consider any of this evidence in his decision.

**PRAYER FOR RELIEF**

WHEREFORE, Queen City respectfully requests that this Court:

103. Reverse the ALJ's decisions that Medicare does not cover the hospice services under review.

104. Reverse the ALJ's determination that Queen City does not qualify for a limitation or waiver of liability for any non-covered services pursuant to the applicable sections of the Medicare statute.

105. Award to Queen City all costs, damages, and attorneys' fees allowed under applicable law.

106. Grant to Queen City any other legal or equitable relief that the Court may deem just and proper.

Respectfully Submitted,

Dated: October 19, 2026

*/s/ Andrew B. Barras*
Andrew B. Barras (0088600)
**KEATING MUETHING & KLEKAMP PLL**
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Tel: (513) 579-6540
Fax: (513) 579-6457
abarras@kmklaw.com

Adam L. Bird (*pro hac vice* application forthcoming)
D.C. Bar No. 1005485
**CALHOUN BHELLA LLP**
2121 Wisconsin Avenue N.W., Suite 200
Washington, D.C. 20007
Tel: (202) 804-6031
Fax: (214) 981-9203
abird@calhounbhella.com

**Attorneys for Queen City Hospice, LLC**